FILED

2022 Mar-22  AM 09:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| MICHAEL BLAKE LECROY, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 4:20-cv-01300-SGC |
| SOCIAL SECURITY | ) |
| ADMINISTRATION, Commissioner, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION[1]

The plaintiff, Michael Blake Lecroy, Jr., appeals from the decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his application for Supplemental Security Income ("SSI"). Lecroy timely pursued and exhausted his administrative remedies, and the Commissioner's decision is ripe for review pursuant to 42 U.S.C §§ 405(g) and 1383(c)(3). For the reasons discussed below, the Commissioner's decision is due to be affirmed.

### I.    Procedural History

Lecroy has a high school education but no past relevant work experience. (Tr. at 31, 44-46). In his application for SSI, filed on January 3, 2017, Lecroy alleged he became disabled on July 1, 2003, due to a variety of mental impairments. (*Id.* at 26,

---

[1] The parties have consented to the exercise of full dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 15).

76).  Lecroy later amended his application to allege January 3, 2017, as the onset date of his disability.  (*Id.* at 26, 175).  After his claims were denied, Lecroy requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 99-101). The ALJ held a hearing on February 7, 2019, and denied Lecroy's claims on March 14, 2019.  (*Id.* at 26-33, 40-61).  Lecroy was 22 years old when the ALJ issued his decision.  (*Id.* at 31, 33).  After the Appeals Council denied review of the ALJ's decision (*id.* at 1-4), that decision became the final decision of the Commissioner, *see Frye v. Massanari*, 209 F. Supp. 2d 1246, 1251 (N.D. Ala. 2001) (citing *Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998)).  Thereafter, Lecroy commenced this action.  (Doc. 1).[2]

## II.    Statutory and Regulatory Framework

To establish eligibility for disability benefits, a claimant must show "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a).  The Social Security Administration ("SSA") employs a five-step sequential analysis to determine an individual's eligibility for disability benefits. 20 C.F.R. §

---

[2] Lecroy re-applied for SSI at some point and was determined to have become disabled on October 19, 2020.  (Doc. 19 at 1; Doc. 19-1).

2

416.920(a)(4).

First, the Commissioner must determine whether the claimant is engaged in "substantial gainful activity."  *Id.* at § 416.920(a)(4)(i).  If the claimant is engaged in substantial gainful activity, the Commissioner will find the claimant is not disabled.  *Id.* at § 416.920(a)(4)(i) and (b).  At the first step, the ALJ determined Lecroy had not engaged in substantial gainful activity between January 3, 2017, the date on which he filed his application for SSI and his amended disability onset date, and March 14, 2019, the date of the ALJ's decision (the "relevant period").  (Tr. at 28).[3]

If the claimant is not engaged in substantial gainful activity, the Commissioner must next determine whether the claimant suffers from a severe physical or mental impairment or combination of impairments that has lasted or is expected to last for a continuous period of at least twelve months.  20 C.F.R. § 416.920(a)(4)(ii).  If the claimant does not have a severe impairment or combination of impairments, the Commissioner will find the claimant is not disabled.  *Id.* at § 416.920(a)(4)(ii) and (c).  At the second step, the ALJ determined that during the relevant period Lecroy had the following severe impairment: "Neurodevelopmental/ADHD Disorder."  (Tr. at 28).

---

[3] *See Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (noting SSI claimant must demonstrate disability between date of SSI application and date of ALJ's decision).

If the claimant has a severe impairment or combination of impairments, the Commissioner must then determine whether the impairment meets or equals one of the "Listings" found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. § 416.920(a)(4)(iii).  If the claimant's impairment meets or equals one of the Listings, the Commissioner will find the claimant is disabled.  *Id.* at § 416.920(a)(4)(iii) and (d).  At the third step, the ALJ determined that during the relevant period Lecroy did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listings.  (Tr. at 28).

If the claimant's impairment does not meet or equal one of the Listings, the Commissioner must determine the claimant's residual functional capacity ("RFC") before proceeding further.  20 C.F.R § 416.920(e).  The ALJ determined that during the relevant period Lecroy had the RFC to perform a full range of work at all exertional levels but with certain non-exertional limitations.  (Tr. at 29).[4]  The ALJ explicitly found Lecroy could maintain adequate social interactions with his co-workers, supervisors, and the public without any substantial restrictions.  (*Id.*).

Typically, at the fourth step the Commissioner compares an assessment of the

---

[4] Those limitations were that Lecroy could perform only simple, repetitive, routine work; would require simple, direct, concrete supervision; might need intermittent reminders and supervision; would do best in a well-spaced work setting with his own work area or an area where he could frequently work alone; could not be required to work at fast-paced production line speed; should have only occasional, gradually-introduced workplace changes; was required to have regular work breaks at least every two hours; and could set ordinary daily work goals but would need assistance with long-term or complex planning.  (Tr. at 29-30).

claimant's RFC with the physical and mental demands of the claimant's past relevant work.  *Id.* at § 416.920(a)(4)(iv) and (e).  Because Lecroy has no past relevant work, the Commissioner simply proceeded to the fifth step.

At the fifth step, the Commissioner determines whether the claimant is capable of performing work that exists in substantial numbers in the national economy in light of the claimant's RFC, age, education, and work experience.  20 C.F.R. § 416.920(a)(4)(v) and (g)(1).  If the claimant is capable of performing other work, the Commissioner will find the claimant is not disabled.  *Id.*  at § 416.920(a)(4)(v) and (g)(1).  If the claimant is not capable of performing other work, the Commissioner will find the claimant is disabled.  *Id.*  at § 416.920(a)(4)(v) and (g)(1).

At the fifth step, considering Lecroy's age, education, work experience, and RFC, the ALJ determined there are jobs existing in significant numbers in the national economy, such as those of industrial sweeping cleaner and floor waxer, that Lecroy can perform.  (Tr. at 32).  Therefore, the ALJ concluded Lecroy is not disabled.  (*Id.* at 32-33).

## III.   Standard of Review

Review of the Commissioner's decision is limited to a determination of whether that decision is supported by substantial evidence and whether the Commissioner applied correct legal standards.  *Crawford v. Comm'r of Soc. Sec.*,

363 F.3d 1155, 1158 (11th Cir. 2004).   A district court must review the Commissioner's findings of fact with deference and may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).   Rather, a district court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (internal citations omitted).   Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.*  It is "more than a scintilla, but less than a preponderance." *Id.*  A district court must uphold factual findings supported by substantial evidence, even if the preponderance of the evidence is against those findings. *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996) (citing *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990)).

A district court reviews the Commissioner's legal conclusions *de novo*. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993).  "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## IV.    Discussion

On appeal, Lecroy argues (1) the ALJ failed to state with adequate clarity his grounds for assigning only partial weight to the opinion of June Nichols, Psy.D.; (2) although the ALJ asserted he assigned partial weight to Dr. Nichols's opinion, he in fact rejected the opinion in full and improperly so; (3) the ALJ's RFC finding is not supported by substantial evidence; and (4) the ALJ relied on an incomplete hypothetical question posed to the vocational expert at step five of the sequential analysis.  (Docs. 19, 21).[5]

### A.    Dr. Nichols's Opinion[6]

" 'Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions.'"  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178-79 (11th Cir. 2011) (quoting 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)).   "[T]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor."  *Id.* at 1179 (citing *Sharfarz v.*

---

[5] The court addresses the first and second claims of error together in subsection A below.

[6] As stated, Lecroy filed his application for SSI on January 3, 2017.  Therefore, 20 C.F.R. § 416.927, not 20 C.F.R. § 416.920c, applies in this case.  Both regulations prescribe a framework for evaluating medical opinions.  The former regulation applies to claims filed before March 27, 2018, while the latter regulation applies to claims filed on or after that date.

*Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)). " 'In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence.'" *Id.* (quoting *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)). "Therefore, when the ALJ fails to 'state with at least some measure of clarity the grounds for his decision,' we will decline to affirm 'simply because some other rationale might have supported the ALJ's conclusion.'" *Id.* (quoting *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984)).

"The ALJ may consider many factors when weighing medical evidence, including the claimant's relationship with the examining or treating physician, whether a medical opinion is well supported, whether a medical opinion is consistent with the claimant's records, and a doctor's specialization." *Wilcox v. Comm'r, Soc. Sec. Admin.*, 442 F. App'x 438, 439 (11th Cir. 2011); *see also* 20 C.F.R. § 416.927(c) (identifying factors relevant to assigning weight to medical opinions). "An ALJ may reject any medical opinion if the evidence supports a contrary finding." *Arnold v. Soc. Sec. Admin., Comm'r*, 724 F. App'x 772, 779 (11th Cir. 2018) (citing *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985)).

Dr. Nichols is a licensed psychologist. Serving as a consultant for Disability Determination Services ("DDS"), she evaluated Lecroy on February 21, 2017. (Tr. 339-41). She reviewed records provided by DDS, took a history from Lecroy, and

examined Lecroy's mental status. (*Id.* at 339-41). She noted Lecroy reported his activities to include playing with his cousin, going out to eat with his friends, playing basketball with his youth pastor, and attending church. (*Id.* at 340, 341). Her mental status examination revealed Lecroy's mood, thought processes, and thought content were within normal limits; his recent and remote memory was grossly intact; his general fund of knowledge and mental processing speed were adequate; his thinking was somewhat abstract in nature; and his judgment and insight were fair. (*Id.* at 340-41). She noted Lecroy cooperated throughout the evaluation. (*Id.* at 341).

Dr. Nichols ultimately offered the opinion Lecroy has (1) intellectual limitations and impulse issues that would impair his ability to respond appropriately to supervision, co-workers, and work pressures in a work setting; (2) deficits that would interfere with ability to remember, understand, and carry out work-related instructions; and (3) deficits in the areas of concentration, persistence, and pace. (*Id.* at 341).

The ALJ stated he gave partial weight to Dr. Nichols's opinion. (*Id.* at 31). More specifically, he noted Dr. Nichols's opinion Lecroy would have some difficulty concentrating and carrying out work-related instructions was consistent with the longitudinal records and supported by Dr. Nichols's own findings. (*Id.*). He noted, however, that Dr. Nichols's opinion Lecroy would have difficulty responding appropriately to supervision and co-workers was inconsistent with the

longitudinal record and not supported by Dr. Nichols's own assessment of Lecroy's judgment and insight as fair. (*Id.*).

It is unclear why Lecroy believes the ALJ rejected Dr. Nichols's opinion in full. It is clear the ALJ credited Dr. Nichols's opinion regarding Lecroy's limitations in the areas of concentration and carrying out work-related instructions but not her opinion regarding Lecroy's limitations with respect to interacting with co-workers and supervisors. It also is unclear why Lecroy believes the ALJ insufficiently articulated his reasons for discrediting Dr. Nichols's opinion regarding his limitations with respect to interacting with co-workers and supervisors. As reasons for discrediting that opinion, the ALJ identified (1) the inconsistency of the opinion with the longitudinal record and (2) the failure of Dr. Nichols's own evaluation to support the opinion. (*Id.* at 31).

These were appropriate reasons for discrediting the opinion. *See Flowers v. Comm'r of Soc. Sec.*, 441 F. App'x 735, 741-43 (11th Cir. 2011) (holding ALJ did not err in discounting opinions of treating and examining physicians because those opinions were not supported by the physicians' own clinical findings); *Kelly v. Comm's of Soc. Sec.*, 401 F. App'x 403, 407-08 (11th Cir. 2010) (holding ALJ did not err in discounting treating physician's opinion because that opinion was not supported by other evidence of record); *Jarrett v. Comm'r of Soc. Sec.*, 422 F. App'x 869, 873 (11th Cir. 2011) ("Generally, the more consistent a physician's opinion is

with the record as a whole, the more weight an ALJ should place on that opinion."); 20 C.F.R. § 416.927 (stating same proposition).[7]

Substantial evidence supports the ALJ's finding the opinion at issue was not consistent with the longitudinal record.  That record reflects Lecroy has suffered from one or more mental impairments since he was a child.  His mother reported he was diagnosed with attention deficit hyperactivity disorder ("ADHD") when he was five years old.  (Tr. at  304).  He also received diagnoses of bipolar disorder, impulse control disorder, intermittent explosive disorder, and mild mental retardation during childhood.  (*Id.* at 286, 288-90, 357, 361, 364).[8]  These impairments have caused him to experience or exhibit hyperactivity, difficulty maintaining attention, defiant behaviors, mood instability, anger and impulse control issues, auditory hallucinations, and suicidal and homicidal ideation.  (*See, e.g., id.* at 9, 72, 304-07, 360, 363-64, 366-67, 382, 384, 386, 389, 391).  He has been prescribed antipsychotic and other medication to manage his symptoms and has been hospitalized on at least three occasions.  (Id. at 292, 303, 310, 364, 366-68).   His first hospitalization

---

[7] The court notes the opinion of a one-time examining psychologist is not entitled to deference. *See McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004); *Sober v. Comm'r, Soc. Sec. Admin.*, 841 F. App'x 109, 112 (11th Cir. 2020).

[8] David R. Wilson, Ph.D., serving as a consultant for DDS, evaluated Lecroy on February 4, 2005. (Tr. at 282-86).  As part of this evaluation, he administered the Wechsler Intelligence Scale for Children – Third Edition to Lecroy, which yielded a Full Scale Intelligence Quotient of 63.  (*Id.* at 285).

occurred around 2006 when he was admitted to Children's Hospital for approximately nine days after experiencing auditory hallucinations that commanded him to hurt his cousin with a knife.  (*Id.* at 9, 304-05, 363).[9]  The second hospitalization occurred in 2008 when he was admitted to Mountain View Hospital for approximately two weeks after experiencing increased agitation, irritation, and aggressive behavior that culminated in an episode where he hit multiple classmates at school and his grandmother when she went to pick him up.  (*Id.* at 304-05, 357; 363-65, 389-93).  The third hospitalization occurred in 2011 when he was admitted to UAB Hospital for approximately six days, again after exhibiting increased aggression at school and home.  (*Id.* at 305, 366-68, 381-88).  Records of Lecroy's second and third hospitalizations indicate he did not exhibit any major behavioral issues during those stays and was stable at discharge.  (*Id.* at 365, 368).

After his third hospitalization, Lecroy received outpatient treatment at Mountain Lakes Behavioral Health for less than a year.  (*Id.* at 288-290, 292-96, 302, 304-311).  Records of this treatment indicate that with medication management his problems with attention and mood were stable.  (*Id.* at 292-96).  There is no record of Lecroy having received any treatment for his mental impairments between the fall of 2012 and January 8, 2019, when he presented to CED Mental Health

---

[9] The record suggests Lecroy chased his cousin with a knife but did not harm her.  (Tr. at 9, 304). It is unclear whether Lecroy also attempted to harm himself during this incident.  (*Id.* at 9, 363, 391).

Center shortly before the February 7, 2019 hearing before the ALJ. (*Id.* at 62-72). His intake paperwork notes his history of anger, violence, and command-type auditory hallucinations and that his mother was concerned he was no longer taking his medication. (*Id.* at 72).[10]

   In addition to the foregoing medical evidence, the record includes documentation related to Lecroy's Individualized Education Program; an assessment made by Angela Register, Ph.D., in her capacity as a state psychological consultant; and a third-party function statement completed by Lecroy's mother on January 14, 2017. Lecroy's IEP for the 2014-2015 school year noted his strengths were that he was friendly with his peers and always willing to help others and that a Vocational Evaluation indicated he would enjoy a "social job." (*Id.* at 328, 333). Dr. Register offered the opinion Lecroy would have some difficulty sustaining concentration to remember and carry out detailed tasks but would not experience significant problems getting along with co-workers or peers, accepting instructions and responding appropriately to criticism from supervisors, or otherwise maintaining adequate social interactions with the public, peers, or supervisors. (*Id.* at 83, 86-87). The ALJ gave Dr. Register's assessment great weight. (*Id.* at 31).

---

[10] Lecroy returned to CED Mental Health Center for an assessment in February 2019 and received outpatient treatment there between June and September 2019. (Tr. at 8-17, 73-75). Lecroy submitted these records to the Appeals Council as additional evidence after the ALJ issued his decision, and the Appeals Council noted they did not relate to the relevant period. (*Id.* at 2).

Lecroy's mother stated in her third-party function report that Lecroy's daily activities include talking to friends and that four or five times each month he attends church, goes out to eat with his friends, and plays basketball with them. (*Id.* at 187-94). The ALJ gave the third-party function report completed by Lecroy's mother great weight to the extent it was consistent with the longitudinal record. (*Id.* at 31).

Substantial evidence also supports the ALJ's finding the opinion at issue was not supported by Dr. Nichols's own evaluation of Lecroy. As stated, Dr. Nichols noted Lecroy cooperated throughout the evaluation, and she determined Lecroy's judgment and insight to be fair. (*Id.* at 341). She also noted Lecroy reported his activities to include playing with his cousin, going out to eat with his friends, playing basketball with his youth pastor, and attending church. (*Id.* at 340, 341).[11]

---

[11] Lecroy asserts in passing that the ALJ cannot substitute his judgment for that of the medical and vocational experts. (Doc. 19 at 20; Doc. 22 at 4-5). That may be true. *See Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982) (holding ALJ improperly substituted his judgment of claimant's condition for that of medical and vocational experts). However, that is not what the ALJ did in this case. He credited the medical opinion of one mental health professional over another after considering the factors enumerated in 20 C.F.R. § 416.927 and discussed in the relevant case law. Lecroy also argues this case is like *Wilder v. Chater*, 64 F.3d 335 (7th Cir. 1995), in which the Seventh Circuit reversed and remanded a case where the ALJ "[went] against the only medical evidence in the case, that of a psychiatrist not retained by the applicant but appointed by the administrative law judge himself to advise on [the claimant's] condition." (Doc. 19 at 21-27; Doc. 22 at 5-8). This case is not like *Wilder* because Dr. Nichols's opinion was not the only medical opinion of record regarding Lecroy's limitations. Finally, Lecroy asserts "[t]he usual rule is that, when a party places a witness on the stand, he thereby vouches for his credibility, and cannot impeach his own witness." (Doc. 22 at 4). He cites *Cone v. Ragan*, 288 Ala. 352 (1972), and *Holloway v. Robertson*, 500 So. 2d 1056 (1986), to support this assertion. (*Id.*). Those Alabama Supreme Court cases address a party's attempt to impeach his own witness during a trial on a personal injury claim and a medical malpractice claim, respectively, and have nothing to do with an ALJ's assessment of medical opinions in the context of a disability claim.

### B.   RFC Determination

Lecroy asserts the determination he has the RFC to perform a full range of work at all exertional levels but with certain non-exertional limitations is not supported by substantial evidence because it does not include the limitation with respect to his ability to interact with co-workers and supervisors, as to which Dr. Nichols opined.  Because the court has concluded the ALJ properly discredited this opinion offered by Dr. Nichols, Lecroy's claim of error with respect to the ALJ's RFC assessment is meritless.[12]

### C.   Hypothetical Posed to Vocational Expert

An ALJ may use a vocational expert to determine whether there are jobs existing in significant numbers in the national economy that a claimant can perform. *See Wolfe v. Chater*, 86 F.3d 1072, 1077-78 (11th Cir. 1996) (articulating circumstances under which an ALJ typically uses a vocational expert); *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) (same).  A vocational expert is "an expert on the kinds of jobs an individual can perform based on his or her capacity and impairments." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004).  For a vocational expert's testimony to constitute substantial evidence supporting an

---

[12] Dr. Nichols's opinion with respect to Lecroy's difficulty concentrating and carrying out work-related instructions is reflected in the non-exertional limitations the ALJ did include in his assessment of Lecroy's RFC.  Also, Lecroy does not argue the ALJ should have included exertional limitations in his RFC assessment.

ALJ's determination there are other jobs a claimant can perform, the ALJ must pose a hypothetical question to the vocational expert that includes all the claimant's impairments.  *Wilson*, 284 F.3d at 1227; *see also McSwain*, 814 F.2d at 619-20 (holding ALJ's determination claimant could do other work was supported by substantial evidence where vocational expert identified two jobs that would accommodate an individual possessing claimant's skills, impairment, and limitation).  An ALJ is not required to include findings in a hypothetical that he has properly rejected as unsupported.  *Crawford*, 363 F.3d at 1161; *see also McSwain*, 814 F.2d at 620 n.1 (holding ALJ did not err in failing to include in hypothetical restrictions based on epilepsy and depression where claimant testified his epilepsy was substantially controlled by medication and did not present substantial medical evidence of depression).

Lecroy asserts the hypothetical question the ALJ posed to the vocational expert was incomplete because it did not include the limitation with respect to his ability to interact with co-workers and supervisors, as to which Dr. Nichols's opined. Because the court has concluded the ALJ properly discredited this opinion offered by Dr. Nichols, Lecroy's final claim of error also is meritless.

## V. Conclusion

Having reviewed the administrative record and considered all the arguments presented by the parties, the court finds the Commissioner's decision is due to be

16

**AFFIRMED**.  A separate order will be entered.

      **DONE** this 22nd day of March, 2022.

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE